## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

Mikayla Cheyenne Savage,

           Plaintiff,

v.

Harris County, Texas; Sheriff Ed Gonzales, in his official capacity; Detention Officer Arnoldo Martinez, in his individual capacity; Detention Officer Andrew Rada, in his individual capacity; Administrative Operations Officer Danika Mathews, in her individual capacity; Detention Officer Ozalynn Lozano, in his individual capacity; Detention Officer Trucell Lagarde, in her individual capacity; Detention Officer Taylor Hodges, in his individual capacity; Detention Officer Gloria Ezeoke, in her individual capacity; Law Enforcement Officer Michael Thomas, in his individual capacity; Law Enforcement Officer Lakisha Cheatham, in her individual capacity; and Detention Officer Marilyn John, her individual capacity,

           Defendants.

Civ. Case No. <u>4:24-cv-00666</u>

**AMENDED COMPLAINT, REQUEST FOR RELIEF, AND JURY DEMAND**

     1.    This case is necessitated by the dereliction of duty of elected and other public officials who deliberately ignore the ongoing myriad physical, mental, and emotional harms inflicted on prisoners in the Harris County Jail ("HCJ" or "the Jail"), a house of horrors that is unfit for human habitation. These officials continue to turn a blind eye to the staggering number of serious assaults, harassment, and even deaths intentionally or recklessly caused by unaccountable detention officers in the Jail; the consistent medical neglect and maltreatment of prisoners by medical staff; the unwillingness of other detention officers to speak up or intervene to protect prisoners from violence; and the callous and inhumane attitudes of intake officers,

medical, and other staff toward pregnant women prisoners. All of these horrors happen outside the awareness of taxpayers who are unknowingly funding this shameful malfeasance and wrongful conduct.

2.      Plaintiff Mikayla Cheyenne Savage brings this action for violation of federal law and Texas state law to seek redress for grievous injuries she suffered at the hands of Defendants while she was incarcerated at the Harris County Jail.

3.      Mikayla Savage was a petite 23-year-old pregnant woman when she and her unborn child became two of the many Harris County community members who have been brutalized, and even killed, by the Jail and its inhumane staff.

4.      During her three months in the Jail—where she was detained because she could not afford bail on charges that were ultimately dismissed—Mikayla endured heinously uninhabitable living conditions, including a feces-streaked cell, and at least six separate physical and sexual assaults. These included a deadly assault by a guard that caused her to miscarry her pregnancy; a brutal gang rape shortly after a traumatic abortion resulting from her miscarriage; and several vicious assaults that guards observed, permitted to continue, and at times even participated in. Mikayla's tenure in the Jail was so horrific that she attempted suicide several times, yet she continued to be denied true mental health services or other important care.

5.      Mikayla's life was irreparably and traumatically changed by her short time in the Jail. She will never be able to hold or be loved by the child she lost, and she lives daily with the trauma she endured while trapped in that hellscape.

6.      What Mikayla suffered, however, is neither atypical nor unusual in the Jail; instead, it is part of a horrifying pattern that government actors simply permit to continue.

7.      It has been well known for decades that HCJ is one of the most violent and deadly

jails in the country. As described in more detail below, HCJ's long history is rife with guards assaulting prisoners to death, failing to protect prisoners from other assaults, punitively using solitary confinement and permitting suicide attempts by vulnerable detainees, and medically neglecting pregnant women.

8.    Indeed, in the weeks leading up to the filing of this case, videos have surfaced showing detention officers assaulting prisoners while other detention officers and prisoners watch, an almost-daily occurrence.

9.    Harris County is well aware of the devastating and unconstitutional issues within its Jail. In 2022 alone, the year at issue in this case, 28 people died in the Jail largely from guard assaults and medical neglect—a record-high number following years of higher-than-average assaults and fatalities. Violent incident report data shows that from May 2020 to May 2023, incidents of "use of force leading to bodily injury" increased nearly 200% and assaults increased 39%.[1] Texas Public Radio reported in early 2022 that HCJ detainees had a 1-in-10 chance of being assaulted in the Jail by a guard or another detainee.[2] In 2023, the Texas Commission on Jail Standards inspection found that HCJ failed to treat medical issues in a timely manner and failed to comply with minimum jail standards related to hygiene and staffing. Documented cases of assault, medical neglect, failure to protect, and wrongful death in HCJ have led to the filing of over 50 civil rights complaints against HCJ over the past decade.

---

[1] Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023).

[2] Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023); Eric Dexheimer, Alexandra Kanik, et al., *The most dangerous Texas jails, ranked by inmate deaths, use-of-force in exclusive Hearst analysis*, Houston Chronicle, Aug. 17, 2023, *available at* https://www.houstonchronicle.com/news/investigations/article/texas-jails-compared-use-of-force-inmate-deaths-18272201.php (last visited Nov. 1, 2023) ("Even spread among its census of about 9,000 prisoners, the facility's average of 6,816 inmate assaults over each of the past five years stands out among Texas jails.  That's more than four times the number and two times the rate of the next closest facility, Bexar County Jail.")

10.     Mikayla is not the only pregnant woman who was subject to inhumane treatment at HCJ.  As but one other example, in May 2022, guards ignored a pregnant mentally ill woman while she was in labor and left her to give birth in her solitary confinement cell alone, forcing her to bite through her umbilical cord to complete the birthing process.[3]

11.     And yet, officials have entirely disregarded the human suffering within the Jail's walls for decades, blaming external factors and continuing to sit on their hands while death and assault rates rise. These conditions are so harmful that the only solution to this epidemic must be a massive reduction in the population within the overcrowded facility through large-scale releases and refusals to detain individuals from the community. Reducing the population in this Jail is the only way to ensure that individuals can get the medical care they need, that they can remain safe in the facility, and that the guards can be held accountable for their abusive behavior.

12.     Mikayla deserves justice from the systemic and individual actors who caused her and her child irreparable and life-altering harm.

## JURISDICTION

13.     This Court has subject matter jurisdiction over Mikayla's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

14.     This Court has supplemental jurisdiction over Mikayla's claims under Texas state law pursuant to 28 U.S.C. § 1367.

15.     Venue lies in the Southern District of Texas under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action took place in this District and

---

[3] *See, e.g.*, Jessica Pishko, *Why Do People Keep Dying in Harris County Jail?*, The Appeal, Mar. 9, 2023, *available at* https://theappeal.org/kim-ogg-fred-harris-jaquaree-simmons-harris-county-jail-deaths/ (last visited Jan. 18, 2024); Elizabeth Rossi, Eric Reinhart, & Krish Gundu, *Pregnant People are Shackled and Abused in Harris County Jail*, The Appeal, Feb. 8, 2023, *available at* https://theappeal.org/pregnant-people-shackled-abused-crisis-harris-county-jail/ (last visited Jan. 18, 2024).

Mikayla resides in this District.

**PARTIES**

16.     Plaintiff Mikayla Cheyenne Savage is a now-24-year-old Black woman who was confined in HCJ from approximately June 2, 2022 through September 1, 2022, while she was 23 years old and pregnant.

17.     Defendant Harris County, Texas (Harris County) is a municipal corporation organized under the laws of the State of Texas. The Harris County Sheriff's Office (HCSO) is a division of Harris County and operates the Jail. Defendant Sheriff Ed Gonzales is an employee in charge of HSCO and thus is also the Administrator in charge of the Jail. *See* Tex. Loc. Gov't Code § 351.041. Sheriff Gonzales is the final policymaker for all law enforcement decisions in Harris County, acting with authority granted to him by Harris County, and is named in his official capacity.

18.     Defendant Arnoldo Martinez was a Detention Officer in HCJ at all times relevant to this case. He is being sued in his individual capacity.

19.     Defendant Andrew Rada is a Detention Officer in HCJ. He is being sued in his individual capacity.

20.     Defendant Danika  Mathews is an Administrative Operations Officer in HCJ. She is being sued in her individual capacity.

21.     Defendant Ozalynn Lozano is a Detention Officer in HCJ. He is being sued in his individual capacity.

22.     Defendant Trucell Lagarde is a Detention Officer in HCJ. She is being sued in her individual capacity.

23.     Defendant Taylor Hodges is a Detention Officer in HCJ. He is being sued in his

individual capacity.

24.    Defendant Gloria Ezeoke is a Detention Officer in HCJ. She is being sued in her individual capacity.

25.    Defendant Michael Thomas is a Law Enforcement Officer in HCJ. He is being sued in his individual capacity.

26.    Defendant Lakitha Cheatham is a Law Enforcement Officer in HCJ. She is being sued in her individual capacity.

27.    Defendant Marilyn John is a Detention Officer in HCJ. She is being sued in her individual capacity.

28.    All Detention Officer Defendants acted jointly with the government Defendants, assuming a traditional public function in their roles as Detention Officers, and were under the control of the government Defendants.

29.    All Defendants were acting at all relevant times under color of state law.

## FACTUAL ALLEGATIONS

**The Harris County Jail is Unfit to Detain Humans**

30.    HCJ, operated by HCSO, is the fourth largest pre-trial detention facility in the country. Nearly 80% of the people detained in the Jail at any given time are pretrial and have not yet been convicted of the crimes for which they are being detained in these unconstitutional conditions.[4]

31.    In 2022, the Jail detained an 11-year high of over 10,000 people every day, a 24% increase in the jail population from 2020 alone.[5] HCJ leadership has admitted that the Jail is

---

[4] *See* Nili Blanck, *"It Smells of Despair": What's Going On Inside the Harris County Jail?*, Texas Monthly, Mar. 29, 2023, *available at* https://www.texasmonthly.com/news-politics/harris-county-jail-bail-reform/ (last visited Nov. 1, 2023).

[5] *See* Press Release, Civil Rights Corps & Texas Jail Project, *28 Dead This Year And Counting:  The Human Rights*

overcrowded; specifically, former Assistant Chief for Detentions Command at HCSO, Shannon Herklotz has stated that "the rate [that prisoners are] coming in is exceeding the rate they're going out. I'm just out of room."[6] Overcrowding has been shown to exacerbate violence and unconstitutional conditions of confinement in carceral settings.[7]

32.    Horrifyingly, HCJ is already one of the most violent and deadly jails in the country.[8] This ignoble reality has been true for decades now.[9] These conditions led to a population cap imposed by the Fifth Circuit in the 1990s and an investigation by the Department of Justice Civil Rights Division (DOJ) in 2009, which found "systemic deficiencies . . . [that] expose[] detainees to harm or risk of harm from excessive use of force."[10] This finding was based in part on the 2008 murder of a detainee by an officer using a chokehold.

*Crisis In The Harris County Jail*, Nov. 22, 2022, at 4, *available at* https://www.dropbox.com/s/yrzs3g5betbay6e/Jail%20Crisis%20in%20Houston%20-%20Untold%20Stories%20%2811-22-2022%29.pdf (last visited Oct. 30, 2023) (hereinafter "Press Release"); Douglas Ankney, *Soaring Number of Detainee Death Spotlights Ongoing Crisis at Harris County Jail*, Prison Legal News, Aug. 2023, at 6.

[6] Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023).

[7] *Cf.* Katie Rose Quandt & Alex Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, Prison Policy Initiative, May 13, 2021, *available at* https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/ (last visited Jan. 18, 2024); Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023) (Billy Lewis, a detainee, attributed the "anger" and violence to the facility's overcrowding and unwillingness to release people).

[8] *See* Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023) ("The Harris County Jail system is the most violent in Texas based on self-reported assault figures." It "lead[s] the state in both raw assault counts and per-capita assault rates, more than doubling other large urban jails.")

[9] *See* Douglas Ankney, *Soaring Number of Detainee Death Spotlights Ongoing Crisis at Harris County Jail*, Prison Legal News, Aug. 2023, at 1 ("The substandard and unconstitutional conditions at HCJ have been documented at least as far back as 1972," when a consent decree against the jail endeavored—without much success—to "'bring presently existing facilities and operations into compliance with federal and state standards.'").

[10] *See* Douglas Ankney, *Soaring Number of Detainee Death Spotlights Ongoing Crisis at Harris County Jail*, Prison Legal News, Aug. 2023, at 1 (citing *Alberti v. Sheriff of Harris Cty.*, 978 F.2d 893 (5th Cir. 1995)); *see also Alberti v. Sheriff of Harris Cty.*, 937 F.2d 984, 992 (5th Cir. 1991) (discussing the population cap order); Letter from Dep't of Justice to Hon. Ed Emmett re: Investigation of the Harris County Jail (Jun. 4, 2009), at 15, *available at* https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/harris_county_jail_findlet_060409.pdf (last visited Nov. 1, 2023).

33.     But DOJ's investigation and findings did little to stem the flood of officer-involved violence in HCJ. Instead, the following years are replete with horrific examples of harm in the Jail. In 2015, the Houston Chronicle reported that jail staff had been disciplined in more than 120 reported incidents of misuse of force and other abuses of authority between 2009 and 2015, including officers falsely charging detainees to cover up abuses of force.[11]

34.     In 2016, five more officers were fired and indicted after violently attacking a detainee, and three other officers were indicted for several separate unconstitutional uses of force.[12] That year, the County also settled a $400,000 civil lawsuit on behalf of a mentally ill detainee who was "left to languish for weeks in a cell filled with rubbish, feces and swarms of insects."[13] HCJ's director of health services admitted that his staff knew about the situation but asserted that they had "'followed policy and procedure"; six guards were fired and 29 others were suspended over this incident, and two sergeants were charged with tampering with government documents when they signed off on cell checks affirming that the conditions in the man's cell were good.[14] Around this time, shockingly, the Sheriff reduced the number of HCJ internal inspectors and disbanded the internal affairs group that investigated charges against HCSO staff.[15]

---

[11] Anita Hassan, *Inmates accused, charged despite workers' own misconduct*, Houston Chronicle, Dec. 22, 2015, updated Dec. 25, 2015, *available at* https://www.houstonchronicle.com/news/houston-texas/houston/article/Jailers-found-to-falsely-charge-inmates-despite-6716329.php (last visited Nov. 1, 2023).

[12] *See, e.g.*, *Inmate released after jail detention officers suspended on allegations of excessive force*, ABC13 Eyewitness News, Sept. 7, 2016, *available at* https://abc13.com/detention-officers-suspension-excessive-force/1501724/ (last visited Nov. 1, 2023); *5 officers indicted in violent beating of Harris County inmate*, ABC13 Eyewitness News, Dec. 6, 2017, *available at* https://abc13.com/jerome-bartee-harris-county-inmate-beaten-officers-indicted-in-jail-beating-jailers/2742878/ (last visited Nov. 1, 2023); Ciara Rouege, Debra Denise Patterson, & Mike Hubberd, *Mugshots released of Harris County jailers indicted after inmate brutally beaten*, CW39 Houston, Dec. 5, 2017, updated Dec. 11, 2017, *available at* https://cw39.com/news/local/5-detention-officers-indicted-after-severely-beating-a-harris-county-jail-inmate/ (last visited Nov. 1, 2023); *Grand jury indicts 3 Harris Co. Sheriff's Office employees on separate assault cases*, ABC13 Eyewitness News, Oct. 4, 2017, *available at* https://abc13.com/grand-jury-indictment-harris-county-sheriffs-office-assault-charge/2487933/ (last visited Nov. 1, 2023).

[13] Douglas Ankney, *Soaring Number of Detainee Death Spotlights Ongoing Crisis at Harris County Jail*, Prison Legal News, Aug. 2023, at 3

[14] *Id.*

[15] *See id.*

35.    In 2018, a woman accused a guard of raping her and threatening to rape her again if she reported the assault.[16]

36.    In 2021, an officer was accused of encouraging—and watching—eight prisoners attack another prisoner with a broom, boiling water, and a shank, telling them to "hurry up. I'm about to get off work."[17]

37.    Reports of violence, medical neglect, and deaths in HCJ have skyrocketed in line with the Jail's population boom. "Between the summer months of 2019 and 2022, the number of officially recorded assaults in the jail has more than doubled and events involving use of force resulting in bodily injury have more than quadrupled."[18] Data collected by the Houston Chronicle show that "'use of force leading to bodily injury' increased by nearly 200 percent from 2020 to 2023 . . . . Assaults increased from 577 in May 2020 to 803 in May 2023—a 39 percent increase—over the same period."[19] In early 2022, Texas Public Radio reported that HCJ detainees had a 1-in-10 chance of being assaulted in the Jail by a guard or another detainee.[20]

---

[16] *See* Joshua R. Miller, *Mom claims jail guard raped her after pot arrest*, New York Post, May 7, 2018, *available at* https://nypost.com/2018/05/07/mom-claims-jail-guard-raped-her-after-pot-arrest/ (last visited Nov. 1, 2023).

[17] Brooke Taylor, *Harris County detention officer accused of encouraging and watching 8 inmates attack fellow inmate*, ABC13 Eyewitness News, *available at* https://abc13.com/harris-county-inmate-attacked-antwanne-lee-jail-attack/11314007/ (last visited Nov. 1, 2023).

[18] Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023); *see also* Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023) (noting a rise of the years starting in late 2019)

[19] Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023).

[20] Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023); Eric Dexheimer, Alexandra Kanik, et al., *The most dangerous Texas jails, ranked by inmate deaths, use-of-force in exclusive Hearst analysis*, Houston Chronicle, Aug. 17, 2023, *available at* https://www.houstonchronicle.com/news/investigations/article/texas-jails-compared-use-of-force-inmate-deaths-18272201.php (last visited Nov. 1, 2023) ("Even spread among its census of about 9,000 prisoners, the facility's average of 6,816 inmate assaults over each of the past five years stands out among Texas jails.  That's more than four times the number and two times the rate of the next closest facility, Bexar County Jail.")

38.     In 2022 alone, the year at issue in this case, at least 28 people died in HCJ custody. This represents a high-water mark not seen at the Jail in nearly two decades.[21] These deaths are largely attributable to the "dual crises of unchecked violence and consistent medical neglect detainees are allegedly suffering inside Harris County Jail."[22]

39.     In January 2024, a HCJ supervisor leaked videos showing excessive violence and abuse at HCJ.[23] One video shows a detention officer repeatedly hitting a detainee inside a broom closet as a large group of detainees watch. The officer eventually shoves the detainee out of the closet and into another detainee. A candidate for Harris County Sheriff commented on the video, "This is what happens every day" at HCJ.[24]

40.     In February 2024, another incident was caught on camera showing multiple HCJ guards punching a detainee.[25]

41.     Over the last decade, at least 52 civil rights cases have been filed against HCJ ranging from wrongful death to the full panoply of civil rights issues. At least 20 of these lawsuits involve excessive force by guards working in the Jail, including at least 3 cases that resulted in the death of the detainee at issue and one omnibus case filed by 22 directly impacted individuals and their family members that includes several instances of murder by guards.[26] Numerous other deaths

---

[21] Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023).

[22] Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023).

[23] Lucio Vasquez, *Leaked videos appear to show excessive violence, abuse in the Harris County Jail*, Houston Public Media, January 26, 2024, *available at* https://www.houstonpublicmedia.org/articles/news/criminal-justice/2024/01/26/475687/leaked-videos-appear-to-show-excessive-violence-abuse-in-the-harris-county-jail/ (last visited February 13, 2024).

[24] *Id.*

[25] Jessica Wiley, *HCSO investigating jail brawl involving inmate and multiple guards: 'It's excessive force'*, ABC 13 Eyewitness News, Feb. 7, 2024, *available at https://abc13.com/harris-county-jail-inmate-beating-caught-on-camera-dalessandro-chavez-sandoval/14393315/* (last visited Feb. 8, 2024).

[26] *See* Alex Stuckey, *Search our data: 52 lawsuits filed by Harris County Jail inmates, families over treatment and conditions*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/search-our-data-harris-county-

at the hands of guards have gone unlitigated and, at times, unreported.

42.     At least 14 of these lawsuits against HCJ allege a failure to protect by guards, including from assaults by other prisoners. The allegations in these cases ranged from wrongful death to guards orchestrating an assault by other detainees.[27]

43.     A huge number of other deaths and constitutional violations are directly attributable to completely unavailable, substandard, and/or delayed medical care in the Jail.[28] At least 22 of the 52 known civil rights cases against the Jail in the last decade have raised issues relating to poor medical care, including defects that led to death, serious surgeries, and lifelong impairments.[29] Advocates are overrun by reports of poor medical care from the Jail, many of which unfortunately do not reach courts or the media.

44.     A few of the 52 known cases raise concerns with mental health care, including three deaths from suicide—one in solitary confinement, one in general population, and one in the infirmary itself.[30]

45.     HCJ also has a history of treating pregnant women specifically in an inhumane manner. In May 2022, guards ignored a pregnant mentally ill woman while she was in labor and left her to give birth in her solitary confinement cell alone. This woman was forced to bite through her umbilical cord to complete the birthing process.[31] Concerningly, as of August 2022, HCJ

---

jail-inmates-families-sue-over-treatment-and-conditions/ (last visited Nov. 1, 2023).

[27] *See id.*

[28] *See, e.g.*, Press Release, at 6.

[29] *See* Alex Stuckey, *Search our data: 52 lawsuits filed by Harris County Jail inmates, families over treatment and conditions*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/search-our-data-harris-county-jail-inmates-families-sue-over-treatment-and-conditions/ (last visited Nov. 1, 2023).

[30] *See id.*

[31] *See, e.g.*, Jessica Pishko, *Why Do People Keep Dying in Harris County Jail?*, The Appeal, Mar. 9, 2023, *available at* https://theappeal.org/kim-ogg-fred-harris-jaquaree-simmons-harris-county-jail-deaths/ (last visited Jan. 18, 2024); Elizabeth Rossi, Eric Reinhart, & Krish Gundu, *Pregnant People are Shackled and Abused in Harris County Jail*, The Appeal, Feb. 8, 2023, *available at* https://theappeal.org/pregnant-people-shackled-abused-crisis-harris-county-jail/ (last visited Jan. 18, 2024).

detained 50 pregnant women, including Plaintiff Mikayla Savage.

46.     Krishnaveni Gundu, co-founder and executive director of the Texas Jail Project, a critical watchdog and advocacy group, summed up these issues by describing the HCJ system as an "engine[] of violence" and "'a pressure cooker' of stress, anxiety, and violence" with "a culture of systemic neglect, abuse and violence."[32]

47.     It defies rational belief and comprehension for anyone to argue that HCJ leadership and staff were not aware of the issues in their custodial and medical care that very commonly rose—and continue to rise—to the level of constitutional violations, even based only on the 52 filed wrongful death and civil rights lawsuits.

48.     But HCJ leadership and staff are also on notice based on grievances filed by detainees and audits conducted by the Texas Commission on Jail Standards (TCJS), which has written several letters to the Jail informing them of their noncompliance with state standards.

49.     Indeed, HCJ "flunked a Texas Commission on Jail Standards' inspection in March of 2023 after investigators found the jail was failing to follow medical providers' treatment orders for detainees and failing to treat medical issues in a timely manner."[33] The Commission has also "found the facility out of compliance with minimum jail standards related to hygiene and staffing," which it believes has contributed to the violence in the facility.[34]

50.     In March 2023, after TCJS's week-long investigation found HCJ out of compliance

---

[32] Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023); Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Jan. 18, 2024).

[33] Michael Murney, *Harris County Jail records 9th in-custody death of 2023 amid investigations*, Chron., July 5, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-death-texas-18185430.php (last visited Nov. 1, 2023).

[34] Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023).

with state standards, Defendant Sheriff Ed Gonzales "admitted that HCJ had been noncompliant with TCJS for 14 of the last 20 years."[35]

51.    The Sheriff's spokesperson has also described the situation in HCJ as a "crisis."[36]

52.    The rampant constitutional violations in HCJ become even more shocking when one considers that 65% of the County's budget—over $966 million—went to law enforcement in 2022, including the horror house that is HCJ.[37]

53.    Harris County has already paid millions of dollars in legal settlements after killing or deeply mistreating people in HCJ. In just three of the at least 52 cases filed against the Jail in the last decade, the County has paid out over $4.5 million.[38]

54.    And yet the powers that be in Harris County continue to deliberately ignore the harms caused by the Jail, in the broader community, and to the taxpayers funding this malfeasance. It was into this horrific stew of violence and neglect that Mikayla Savage stepped in June 2022.

**Mikayla's Arrest and Incarceration in HCJ**

55.    Mikayla Savage was booked into HCJ on June 2, 2022 on charges of violating a protective order and aggravated assault. Her bail was set at $80,000 for these charges, which neither she nor her family could afford. All of these charges were dismissed and dropped entirely

---

[35] Douglas Ankney, *Soaring Number of Detainee Death Spotlights Ongoing Crisis at Harris County Jail*, Prison Legal News, Aug. 2023, at 6.

[36] Alex Stuckey, *Parents of man who died in Harris County Jail sue officials. They're not the first.*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/parents-of-man-who-died-in-harris-county-jail-sues-officials/ (last visited Nov. 1, 2023).

[37] *See* Press Release at 7; Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023).

[38] *See* Alex Stuckey, *Parents of man who died in Harris County Jail sue officials. They're not the first.*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/parents-of-man-who-died-in-harris-county-jail-sues-officials/ (last visited Nov. 1, 2023); Alex Stuckey, *Search our data: 52 lawsuits filed by Harris County Jail inmates, families over treatment and conditions*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/search-our-data-harris-county-jail-inmates-families-sue-over-treatment-and-conditions/ (last visited Nov. 1, 2023).

on or around August 30, 2022, but not before Mikayla suffered indescribable and unnecessary harm in the Jail.

56.    At the time of her booking, Mikayla was a slight 23-year-old woman who, at 4'11, weighed just over 100 lbs. She was pregnant and was excited to be a mother again.

57.    She shared information about her pregnancy with intake officers and custodial staff when she was booked into the facility, was seen by medical staff about her pregnancy, and received a bottom bunk special-needs designation due to her pregnancy.

58.    Mikayla soon began suffering harassment and abuse at the hands of the guards and, later, by other prisoners with the guards' knowledge.

**Mikayla's Uninhabitable Housing**

59.    First, on or around June 3, Defendant Officers Lozano and Lagarde detained Mikayla in a cell identified as 4L1, which was visibly covered with feces, ridden with bed bugs, had blood on the ceiling, and had no air circulation.

60.    At some point during her detention in this cell, Mikayla vomited because the smell was so bad. Defendant Officers Lozano and Lagarde declined to bring her any cleaning supplies, forcing her to live with the stench of her vomit in addition to the feces and lack of air circulation. When she asked for cleaning supplies, Defendant Officer Hodges retorted, "What do you think this is, the Hilton?" None of the Defendant Officers ever attempted to help her clean her cell or provide her with housing appropriate for a pregnant woman, even though the Jail had a special housing unit set aside for pregnant women.

61.    The conditions in the cell were so vile that Mikayla also passed out and hit her head at one point. She never received medical care for this injury.

62.    Mikayla ultimately was forced to try to clean her cell with the sole blanket she had

been provided by jail staff. She requested a clean blanket, but detention officers brought her one that had feces in it. The detention officers ignored her comment that there were feces in the blanket and walked away without bringing her a clean and sanitary blanket. Finally, after several complaints, another guard brought her a clean blanket. Notably, in July 2022, the Texas Commission on Jail Standards affirmed in a letter that Mikayla had been housed Mikayla with a soiled blanket and that doing so was a violation of minimum jail standards.

63.    For several weeks during June, detention officers also refused to give Mikayla a towel, and she was forced to dry off with her used shirt after showering or washing her hands.

64.    Mikayla filed numerous complaints about the lack of air flow in her cell—in Houston in June—and about the bed bugs that she described as eating her up. She also sought out the help of her mother, Malinda Nash, to report these and other concerns she faced in HCJ several times.

65.    Ms. Nash made numerous calls and complaints to the Jail seeking to protect her child, including at least 26 attempts to reach someone that went entirely unanswered. Finally, Ms. Nash made a formal complaint through HCJ's Inmate Care and Concerns portal on or around June 10, 2022. Inmate Care and Concerns staff were the first of any HCJ staff to actually respond to Ms. Nash. They admitted that Mikayla had received a dirty blanket but that it had since been replaced with a clean one. Shortly after that report to Ms. Nash, a staff member went by Mikayla's cell and took her clean blanket away from her.

66.    After Ms. Nash made yet another complaint about the conditions in which her pregnant daughter was being detained, an investigator informed Ms. Nash that jail staff had inspected Mikayla's cell.

67.    Mikayla remained in the squalid cell for about two weeks, until on or around June

15

16, 2022, when HCJ custodial staff finally moved her to cell 4M2, the "pregnancy tank" in the medical unit at HCJ. There is no explanation for why Mikayla was not initially housed in this area, since correctional and medical staff knew about her pregnancy, including at least Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Officer Rada, Defendant Officer Martinez, Dr. Chandra Higginbotham, Dr. Osinachi Ilomuanya, Dr. Layth H. Alzubaidy, Dr. Rohit Goswany, LN Motunrayo Eyinade, RN Mojisola Alatise, RN Chikodili, LVN Shamarian Neal Davenport, LVN Oyefunke Ogundele-Olisa, LVN Charles Dasi, and Jacon B. Schriner.

68.    Throughout the time she was detained in the fetid cell (and particularly after the incident described below), Mikayla suffered constant harassment and name-calling from Defendant Officer Arnoldo Martinez and told her mother about these ongoing aggressions.

**The First Assault Against Mikayla**

69.    Early on or around the morning of June 6 or 7, 2022, a few days after arriving at the Jail, Mikayla was removed from her cell by guards to go to court. She lined up in the hallway of the fourth floor in HCJ with other women heading to court, in compliance with the instructions of Defendant Officers Andrew Rada and Arnoldo Martinez. For no reason, Defendant Officer Rada told Defendant Officer Martinez to "grab" Mikayla.[39]

70.    Defendant Officer Martinez yanked Mikayla by the collar of her shirt and swung her around like a rag doll. Scared for her safety and the safety of her pregnancy, Mikayla told Defendant Officer Martinez and everyone present in that hallway that she was pregnant. Officer

---

[39] *Accord* Joseph Shapiro, Jessica Pupovac, & Kari Lydersen, *In Prison, Discipline Comes Down Hardest On Women*, NPR, Oct. 15, 2018, *available at* https://www.npr.org/2018/10/15/647874342/in-prison-discipline-comes-down-hardest-on-women (last visited Nov. 2, 2023) ("Across the country, women in prison are disciplined at higher rates than men — often two to three times more often, and sometimes more — for smaller infractions of prison rules.")

Martinez said, "I do not give a f*ck about you or your bastard babies" and continued to assault her.

71.    Defendant Officer Martinez pushed and shoved Mikayla into the wall of the hallway stomach-first, calling her "dumpster trash," "trailer trash," "bitch," and "stupid." He then dragged her and the other women waiting in the hallway with her to court.

72.    After returning from court, Defendant Officer Martinez returned Mikayla to cell 4L1, the cell covered in feces and bed bugs.

**Traumatic Abortion Due to Defendant Martinez's Assault**

73.    While being forced to live in the squalid conditions in cell 4L1 and shortly after her assault by Defendant Officer Martinez, Mikayla began experiencing lower abdominal pain and cramping, nausea, vomiting, a gush of clear or white fluid from her vagina, and later vaginal bleeding. Mikayla feared for the viability of her pregnancy and sought medical care.

74.    After repeatedly seeking medical care and several delays in getting medical attention, Mikayla finally received an ultrasound at a Harris Health hospital on or around June 17 or 18. The ultrasound showed that her pregnancy was no longer viable, and hospital staff informed Mikayla that the miscarriage had occurred within the prior two weeks. Defendant Officer Martinez had assaulted Mikayla within this two-week period.

75.    Medical professionals agree that when a pregnant woman has experienced a trauma to her abdomen shortly before a miscarriage, it is appropriate and standard medical practice to attribute the miscarriage to that trauma, rather than to chance.

76.    Mikayla began feeling unwell again on or around June 20, 2022. She was dizzy, throwing up, had a fever, cold sweats, chills, and no appetite. At one point, Mikayla threw up in her blanket, and guards refused to bring her a new blanket. She submitted numerous requests to

see the medical department, but she never heard back.

77.    Finally, she called her mother, Ms. Nash, to report her symptoms. Ms. Nash called HCJ numerous times over several days in an effort to get Mikayla medical care, but she again got no response. She submitted another formal complaint through the Inmate Care and Concerns portal on or around June 22 or 24.

78.    Advocates at the Texas Jail Project also contacted the Assistant Chief for Detentions Command at HCJ, Shannon Herklotz, about Mikayla's condition on June 24, 2022. They received no response to their outreach.

79.    On June 24, HCJ medical staff finally sent Mikayla to a Harris Health hospital (LBJ). No one told Mikayla why she was being sent to the hospital. Ultimately, she was given an abortion that she found incredibly traumatic.

80.    Mikayla was discharged from the hospital and returned to HCJ on June 25, 2022. Her discharge instructions included several directives with which HCJ staff failed or intentionally declined to comply, including a follow-up appointment at a gynecological clinic on July 1, a wheelchair for 2 days, infirmary housing for 3 days, and bed rest.

81.    When she returned to HCJ, officers placed Mikayla in a holding cell for several hours. Guards refused to bring her pads, rags, or a change of clothing and instead left her to bleed all over herself for the entire time she was in the holding cell.

82.    Medical staff member Rispba McCray-Garrison decided that Mikayla was able to walk and did not need a wheelchair or housing in the infirmary, and so this staff member ignored and rejected those critical discharge instructions from LBJ.

83.    HCJ staff never took Mikayla to an important follow-up appointment for her abortion at LBJ on July 1, 2022.

18

84.     Around this time, Mikayla received a bill at her home address for the outstanding balance from her abortion.

**Additional Assaults Against Mikayla**

85.     McCray-Garrison and a guard quickly moved Mikayla out of the medical unit after her traumatic and invasive abortion and back to general population. There, she suffered a truly horrific series of at least five different physical and sexual assaults within a two-month period while recovering from her abortion. The officers who were entrusted with her care—including Defendant Officer Lagarde, Defendant Officer Rada, Defendant Officer Martinez, Defendant Officer Mathews, Defendant Officer Ezeoke, Defendant Officer Thomas, Defendant Officer Thomas, and Defendant Officer Lakitha Cheatham, who primarily supervised the units Mikayla was in during this period of her incarceration in HCJ—made no efforts to abate these traumatic harms. Instead, these same officers permitted the assaults to continue and, in some cases, even participated in the assaults.

86.     On June 26 or 27, 2022, only one or two days after her post-abortion discharge from the hospital, officers moved Mikayla to cell 4H1, where she was physically and/or sexually assaulted by several other prisoners. Defendant Officers Lagarde, Rada, Cheatham, and Martinez did not intervene to protect Mikayla and instead denied her access to the medical unit or medical care. Mikayla was scared to even tell her mother about the assault for fear that it would happen again. This fear was valid, as she continued to be subject to repeated assaults after this incident.

87.     Officers then moved Mikayla to cell 4F2 on or around June 30th. She was assaulted by a prisoner who fought with her over moving bunks on or around July 8th. Defendant Officer Mathews and Defendant Officer Cheatham did not intervene, nor did they bring Mikayla down to HCJ's medical unit until the day after her assault—even though, upon information and belief, they

19

were aware of her assault and concomitant injuries. In the medical unit, Mikayla complained of pain in her head and pain in her right arm that limited her range of motion and left her unable to raise her hand. HCJ medical staff simply gave Mikayla ibuprofen and sent her back to general population.

88.     Officers moved Mikayla to cell 4C2 on or around July 9th, after her visit to the medical unit. Overnight on or around July 11-12th, other prisoners in the unit tied up Mikayla and sexually assaulted her. Multiple prisoners penetrated Mikayla vaginally and anally with a foreign object.

89.     Guards manning their post in the "picket" could see into the unit during the assault, on information and belief. Defendant Officer Ezeoke failed to intervene to protect Mikayla. Defendant Officer Thomas did not even bring Mikayla down to the medical unit until mid-afternoon on July 12th, after she lodged a Prison Rape Elimination Act complaint. Mikayla received a Sexual Assault Nurses Exam and some prophylactic medication. Detention officers promptly returned her to cell 4C2 on July 13, where she had to spend another unprotected and terrifying night with her assailants.

90.     Mikayla was assaulted again within a day or two of this disturbing gang rape. Prisoners in her housing unit jumped and beat her in plain view of Defendant Officer Martinez. This assault included a prisoner biting Mikayla on her right side so hard that she continues to have a scar to this day. Defendant Officer Martinez—the same individual whose assault caused the miscarriage of her pregnancy—watched Mikayla be assaulted again without intervening.

91.     After the assault, it took Mikayla some time to get up off the floor, where her assailants had left her. Defendant Officer Martinez then decided to step in and continue the assault against Mikayla. He yelled at Mikayla to stand up, even though she could barely open her eyes

and was dizzy from the assault. He yanked her off the floor, handcuffed her, and pushed her against the wall, again. Defendant Officer Martinez dragged her to a holding cell, banged her head against the wall, and shoved his knee into her back in a way that forced her knees into the metal bars on the bed in the cell. He then shockingly bit Mikayla on her back. He concluded the abuse by verbally denigrating and threatening Mikayla, saying "Now bitch, tell your mama I did that!"

92.    Another detention officer witnessed Defendant Officer Martinez's assault of Mikayla, but that officer did not intervene either.

93.    Defendant Officer Martinez continued to regularly work in the housing area where Mikayla was detained after his multiple assaults on her, without any apparent reprimand from HCJ leadership.

94.    None of the guards on staff brought Mikayla to the medical unit until at least after 8:00 the next morning. There, she tearfully presented with multiple injuries, according to medical staff, including pain around her right ribs, pain and contusions on her right arm, limited range of motion in her right fingers and arm (which she could not even put back in her shirt), bruising on her back near her spine, a lesion under her right breast, and a human bite mark "to right area of breast and back."

95.    Over nine hours after the attack, medical records show that her pulse was still concerningly elevated. Mikayla tearfully told medical staff, "they always assault me" and requested a separate housing unit.

96.    Mikayla also told medical staff member Najuma Tasby that she was suicidal after this attack. Tasby's notes detailing Mikayla's disclosure state, "I'm not feeling safe anywhere I go. Been sexually assaulted 2 times already and it is triggered [sic] me real bad where I don't sleep, I cry and gets [sic] depressed. Start having flash backs and seeing the people that done raped me

in the past." Mikayla also told staff member Tasby that she was suffering from anxiety, depression, mood swings, and loss of sleep due to sadness, hopelessness, and crying. She asked several times for a single cell since she had been assaulted so many times. Staff member Tasby noted Mikayla's history of assaults on July 9, 13, and 14, 2022.

97.     At some point around this time, while detained in 4B2, Mikayla was subject to another assault where other prisoners threw the chemicals used to clean their cells on her. Defendant Officer John did not immediately take her to the medical unit for decontamination.

98.     Around July 15th, having received no response to their initial June 24th email and following the series of assaults and rapes Mikayla suffered, Texas Jail Project staff reached back out to Assistant Chief for Detentions Command Herklotz. Assistant Chief Herklotz responded to this contact and acknowledged awareness of Mikayla's Prison Rape Elimination Act complaint, that she had been sent out for a Sexual Assault Nurses Exam, and that an investigation had been commenced. No other action was taken by Jail officials, on information and belief, and Texas Jail Project heard nothing further from Jail leadership about Mikayla's situation or any efforts to keep her safe.

99.     On July 18, 2022, Mikayla returned to the medical division with cuts on her arms. She reported to Dr. Chandra Higginbotham that "she tried to hang herself with her underwear but the guard found her. She has been cutting herself. States she was trying to commit suicide." Dr. Higginbotham simply counseled Mikayla to read the Bible and provided her with no meaningful care for this mental health crisis. She did not have any engagement with a mental health provider until the following day.

100.     On July 20 and 21, Mikayla again presented at the medical unit with suicidal behavior, having swallowed pills on the housing unit. She told LVN Shamarian Neal Davenport

that she swallowed the pills because she was "giving up" and NP Deborah Yisa that "she did because she does not want to live any more." On July 27, she submitted an inmate request in which she reported that she was cutting, was going to kill herself, and that she did not want to live anymore. On July 31st, she submitted another report indicating that she "took someone eles [sic] a lot of pills i wont [sic] to die i need help pleassee [sic]." It took guards days to bring Mikayla to the medical unit after the July 31 incident; when she was finally seen by medical staff, Dr. Mai P. Nguyen dismissed Mikayla's cries for help as "no . . . true attempts."

101.    Mikayla sent another request for mental health supports on August 6, disclosing that she felt "like really hurting myself." Medical unit staff member Najuma Tasby simply "educated [Mikayla] on the 'importance of peace.'"

102.    On August 15, 2022, while again in housing unit 4C2, Mikayla informed the guards overseeing her housing unit that she felt suicidal after being harassed by the women in the unit. They brought her to the mental health unit but returned her to the housing unit before she was able to see any mental health staff members. Mental health staff had to direct the guards to bring her back the next day. During that visit, staff member Tasby callously described Mikayla as having a "history of over-reporting symptoms and evasive behaviors" and listed dates of past incidents, including visits on July 19th and August 2nd when medical staff considered Mikayla's condition so serious that they started her on several mental health medications or increased her dosages.

103.    On or around August 18, back in housing unit 4H where she was initially assaulted, Mikayla was again assaulted by other prisoners in the unit. Defendant Officer Mathews watched as several women jumped Mikayla and threw urine on her, and then she left Mikayla for eight and a half hours without a change of clothes or a blanket. Mikayla called her mother and reported that her eye was swollen and draining and that her hip hurt badly. But Defendants Officer Mathews

refused to take Mikayla to the medical unit until the next day. By that time, Mikayla reported that she had a headache and some vision loss in her left eye. Medical records from NP Olufunke Idonor also noted scratches on Mikayla's face, swelling on her left forehead, and tenderness on her left forehead and the bridge of her nose.

104.    At some point during this series of assaults, friendly prisoners in one of her cells called Mikayla's mother and told Ms. Nash that the assailants were bragging about beating up Mikayla because of Ms. Nash's complaints. Upon information and belief, Mikayla's assailants were told about Ms. Nash's complaints to HCJ supervisors by Defendant Officer Martinez, Defendant Officer Mathews, Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Officer Ezeoke, Defendant Officer Thomas, and Defendant Officer John. Mikayla was scared to stand up for herself for fear of future assaults and additional criminal or disciplinary charges, but she told her mother not to stop making complaints. She feared for her life and felt like she had no other paths to protect herself.

**Solitary Confinement**

105.    After this final late August assault with urine, HCJ guards threw Mikayla in punitive solitary confinement—with no food or change of clothing for the first 24 hours she was there.

106.    Mikayla remained in solitary confinement for the rest of her time in HCJ. This housing placement caused her grave harm and exacerbated the harms she suffered from the onslaught of assaults she had experienced in general population. She continued to receive sub-standard medical care. Specifically, medical staff denied Mikayla access to critical medications that she had been prescribed—for asthma, anxiety, and depression—for the entire time that she was forced to endure solitary confinement. Mikayla begged to be released and to receive medical

care, but HCJ staff ignored her and refused to provide her necessary care.

107.    Instead, an officer rudely told Mikayla to "lay your fucking ass down" and called her a "bitch" when she asked for a towel to dry off after her shower. The officer refused to bring her a towel. Without a towel from the guard, Mikayla was forced to dry off with her worn t-shirt.

108.    Ms. Nash, Mikayla's mother, at her wit's end, filed a complaint with the Texas Department of Public Safety's Rangers investigations unit about the lack of care Mikayla received in solitary confinement.

109.    Mikayla suffered so intensely in solitary confinement and while off her medication that she attempted suicide by hanging or strangling herself with her underwear on August 22, 2022, after numerous warnings to medical staff about her suicidal nature over the preceding weeks.

110.    Even with those warnings, HCJ medical records include no interactions between medical staff and Mikayla from the time of her placement in solitary confinement through her attempt to commit suicide. After her suicide attempt, notes from NP Kenneth Ihaza admit knowledge of her past suicide attempts—noting dates—and that "Pt was scheduled to be seen on 8/15/22 for severe anxiety and [suicidal ideation] but was taken back to the pod before she could be seen." NP Ihaza reported Mikayla's affirmation that she would continue trying to kill herself until she succeeded.

111.    It was only after this August 22nd suicide attempt that medical staff admitted Mikayla to the mental health floor, where she remained in solitary confinement conditions for another almost 10 days. But she was taken off any critical care for suicide precautions by medical staff member Kameelah Rahman-Russell the following day.

**Release from the Harris County Jail**

112.    On August 30, Mikayla went back to court, and the charges against her were

25

dropped entirely.  She was released from HCJ on September 1.

113.    Mikayla suffered gravely during the four months she spent in HCJ. She lost a pregnancy that she very much wanted. She was assaulted physically and sexually at least six times, including an assault that caused her miscarriage, sexual and physical assaults that followed almost immediately upon her traumatic abortion, several assaults by guards for whom she was dependent on her care and safety, and an extended time in solitary confinement, whose dangers and harms are well-documented.

114.    Mikayla retains deep emotional scars from her time in HCJ. She struggles to talk about the sexual assault at all. She experiences frequent nightmares and has to stay up all night or watch cartoons to try to fall back asleep. She is easily triggered to recall these memories, and she has had panic attacks and other debilitating physiological responses to the mere thought of going back into HCJ. She has struggled to function in society fully since her time in HCJ in 2022.

## CLAIMS FOR RELIEF

### COUNT I
### Excessive Use of Force under the Fourteenth Amendment and 42 U.S.C. § 1983
### Against Defendant Officer Arnoldo Martinez and Defendant Officer Andrew Rada

115.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

116.    Defendants Officer Arnoldo Martinez and Officer Andrew Rada purposefully and knowingly used objectively unreasonable and harmful force against Mikayla when Officer Martinez swung her around like a ragdoll and slammed her—pregnant stomach first—into a wall at the direction of Officer Rada on or around June 6 or 7, 2022, as described more fully above.

117.    This use of force was more than *de minimis* and instead was harmful enough to amount to a constitutional violation and to lead to the miscarriage of her pregnancy.

118.    The force that Defendants Martinez and Rada used against Mikayla, as described

above, was not a good-faith effort to maintain or restore discipline and was far in excess of any force that may have been needed in those circumstances, as Mikayla posed minimal if any threat or security concern to these Defendants.

119.    Defendants Martinez and Rada's above-described actions were taken with malice and/or culpable disregard for Mikayla's constitutional rights, as indicated *inter alia* by the facts that: Mikayla was not resisting and was complying with Defendants' instructions to line up for court; Mikayla informed Defendants that she was pregnant; the force used was disproportionate to address any security and order concerns Defendants may have had; Defendant Martinez called Mikayla a "bitch," "dumpster trash," "trailer trash," and "stupid," and he told her that he did not "give a f*ck about you or your bastard babies"; and despite knowing that she was pregnant, Defendant Martinez shoved Mikayla into a wall stomach-first.

120.    Defendants Martinez and Rada's actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including the loss of her pregnancy, loss of enjoyment of life, pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## COUNT II
### Excessive Use of Force under the Fourteenth Amendment and 42 U.S.C. § 1983
### Against Defendant Officer Arnoldo Martinez

121.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

122.    Defendant Officer Arnoldo Martinez purposefully and knowingly used objectively unreasonable and harmful force against Mikayla when he assaulted her by biting her in the back, banging her head against the wall, pushing her body against a wall, yanking her around, shoving his knee into her back, forcing her knees into metal bars on a bed, and denigrating and threatening her verbally, all while she was handcuffed, in or around July 2022, as described more fully above.

123.    This use of force was more than *de minimis* and instead was harmful enough to amount to a violation of Mikayla's constitutional rights.

124.    The force that Defendant Martinez used against Mikayla, as described above, was not a good-faith effort to maintain or restore discipline and was far in excess of any force that may have been needed in those circumstances, as Mikayla posed minimal if any threat or security concern to Defendant Martinez.

125.    Defendant Martinez's above-described actions were taken with malice and/or culpable disregard for Mikayla's constitutional rights, as indicated *inter alia* by the facts that: Defendant Martinez had just watched Mikayla be assaulted by several prisoners, did not intervene, and saw that she had trouble standing and opening her eyes and was dizzy; Mikayla was not resisting and in fact had been handcuffed by this particular Defendant; the force used was disproportionate to address any security and order concerns Defendant Martinez had; Defendant Martinez bit Mikayla; and Defendant Martinez called Mikayla a "bitch" and threatened her to "tell your mama I did that."

126.    Defendant Martinez's actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other non-economic losses in an amount to be proven at trial.

**COUNT III**
**Excessive Use of Force under the Fourteenth Amendment and 42 U.S.C. § 1983**
**Against Defendant Harris County (*Monell* Liability)**

127.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

128.    As described in ¶¶ 9-10 and 27-51 above, the Jail has an extensive history of guards assaulting prisoners, at times leading to death and at other times causing severe injuries akin to what Mikayla suffered. In the past 10 years, at least 20 lawsuits have been filed against HCJ that

specifically raise excessive force by guards working in the Jail, including at least three cases involving the death of a detainee and one omnibus case filed by 22 directly impacted individuals and their family members.[40] Numerous other deaths at the hands of guards have gone uncharged, unlitigated, and, at times, unreported. In the years leading up to Mikayla's assault, publicly reported incidents of assaults and excessive force rose exponentially, in some categories by a shocking 200% and at times leading to a 1-in-10 chance of being assaulted in the Jail.[41] In early 2022, Texas Public Radio reported that HCJ "[led] the state in both raw assault counts and per-capita assault rates, more than doubling other large urban jails" and was out of compliance with minimum statewide standards.[42] This data demonstrate the shocking frequency with which community members are harmed in HCJ and the overtly public nature of this information.

129.    Sheriff Gonzales therefore had or should have had notice of the widespread practices by guards in his and Harris County's employ of brutally and harmfully assaulting detainees entrusted to their custody and care.

130.    These widespread practices are the result of an extreme lack of formal and informal training regarding the use of force and de-escalation techniques, lack of supervision of guards working with detainees in all areas of HCJ, and lack of repercussions for excessive and inappropriate uses of force.

---

[40] *See* Alex Stuckey, *Search our data: 52 lawsuits filed by Harris County Jail inmates, families over treatment and conditions*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/search-our-data-harris-county-jail-inmates-families-sue-over-treatment-and-conditions/ (last visited Nov. 1, 2023).

[41] *See, e.g.*, Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023); Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023); Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023).

[42] Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023).

131.    These widespread practices were allowed to flourish and become so well-settled as to constitute the de facto policy of HCJ because governmental policymakers with authority over the Jail exhibited deliberate indifference to the problem, thereby effectively ratifying it.

132.    Mikayla's injuries were caused in substantial part by these widespread policies, practices, and procedures promulgated by HCJ staff.

133.    Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including loss of her pregnancy, loss of enjoyment of life, pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

### COUNT IV
### Retaliation under the First Amendment and 42 U.S.C. § 1983
### Against Defendant Officer Arnoldo Martinez

134.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

135.    Defendant Officer Arnoldo Martinez retaliated against Mikayla for complaining to her mother and having her mother lodge complaints against Defendant Martinez with jail supervisors. He retaliated by assaulting her, handcuffing her, biting her in the back, and telling her, "Now bitch, tell your mama I did that!"

136.    Mikayla has a First Amendment right to speak out about the unconstitutional conditions and treatment she suffered at HCJ.

137.    Defendant Martinez's comment to Mikayla to "tell your mama" at the conclusion of his second assault of her demonstrates his knowledge of her past complaints and his effort and intent to silence her from making future complaints about his conduct. It also raises the inference that Defendant Martinez's second assault of Mikayla would not have happened but for his intent to retaliate against her.

138.     This assault and his verbal threat were capable of deterring a person of ordinary firmness from further exercising her First Amendment rights.

139.     Defendant Martinez's actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

**COUNT V**
**Failure to Protect under the Fourteenth Amendment and 42 U.S.C. § 1983**
**Against Defendant Officer Martinez, Defendant Officer Mathews, Defendant Officer Lagarde, Defendant Officer Ezeoke, Defendant Officer Thomas, and Defendant Officer John**

140.     Mikayla incorporates each paragraph of this Complaint as if fully restated here.

141.     Defendants Officer Martinez, Officer Mathews, Officer Lagarde, Officer Ezeoke, Officer Thomas, and Officer John knew of and disregarded a substantial risk to Mikayla's health and safety by failing to intervene when she was repeatedly assaulted by other prisoners under the custody and supervision of these guards. These Defendants observed the assaults that Mikayla suffered and thus subjectively knew of the risk to Mikayla and also of the harm she experienced. Reasonable officers observing these assaults also would have been aware of this risk and harm by observing it. By failing to intervene, these Defendants acted with deliberate indifference to Mikayla's health and safety and did not take reasonable measures to abate the risk and harm she suffered.

142.     As a result, Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## COUNT VI
### Failure to Protect under the Fourteenth Amendment and 42 U.S.C. § 1983
### Against Defendant Harris County (*Monell* Liability)

143.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

144.    As described in ¶¶ 9-10 and 27-51 above, the Jail has an extensive history of guards permitting assaults against prisoners (including assaults by other guards) and failing to protect the physical, mental, and emotional safety of those entrusted to their care. In the past 10 years, at least 14 lawsuits have been filed against HCJ that specifically assert a failure to protect by guards across numerous contexts, including at least one case that led to death by assault, another case where guards orchestrated an assault by detainees against the plaintiff, and an omnibus case recently filed by 22 directly impacted individuals and their family members.[43]

145.    In the years leading up to Mikayla's assault, publicly reported incidents of assaults and excessive force rose exponentially, in some categories by a shocking 200% and at times leading to a 1-in-10 chance of being assaulted in the Jail.[44] In early 2022, Texas Public Radio reported that HCJ "[led] the state in both raw assault counts and per-capita assault rates, more than doubling other large urban jails" and was out of compliance with minimum statewide standards.[45] This data demonstrate the shocking frequency with which community members are harmed in HCJ

---

[43] *See* Alex Stuckey, *Search our data: 52 lawsuits filed by Harris County Jail inmates, families over treatment and conditions*, Houston Landing, May 9, 2023, *available at* https://houstonlanding.org/search-our-data-harris-county-jail-inmates-families-sue-over-treatment-and-conditions/ (last visited Nov. 1, 2023).

[44] *See, e.g.*, Krish Gundu & Eric Reinhart, *Why Are In-Custody Deaths Surging at Houston's Harris County Jail?*, Slate, Oct. 25, 2022, *available at* https://slate.com/news-and-politics/2022/10/in-custody-deaths-surging-houston-harris-county-jail.html (last visited Nov. 1, 2023); Michael Murney, *Harris Co. jail violence is surging—how the system is failing detainees*, Chron., July 30, 2023 (updated), *available at* https://www.chron.com/news/houston-texas/article/harris-county-jail-texas-18208700.php (last visited Nov. 1, 2023); Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023).

[45] Paul Flahive, *Advocates and jailers fear riot conditions as violence persists in Harris County*, Texas Public Radio, Jan. 25, 2022, *available at* https://www.tpr.org/texas/2022-01-25/advocates-and-jailers-fear-riot-conditions-as-violence-persists-in-harris-county (last visited Nov. 1, 2023).

and the overtly public nature of this information.

146.    Harris County and Sheriff Gonzales therefore had or should have had notice of the widespread practices by guards in their employ of failing to protect the individuals in their custody and care from brutal and harmful physical and sexual assaults by other detainees in their custody.

147.    These widespread practices are the result of an extreme lack of formal and informal training regarding the need to protect detainees and intervene in assaults by other detainees, lack of supervision of guards working with detainees in all areas of HCJ, and lack of repercussions for such failures to protect.

148.    These widespread practices were allowed to flourish and become so well-settled as to constitute the de facto policy of HCJ because governmental policymakers with authority over the Jail exhibited deliberate indifference to the problem, thereby effectively ratifying it.

149.    Mikayla's injuries were caused in substantial part by these widespread policies, practices, and procedures promulgated by HCJ staff.

150.    Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

### COUNT VII
**Unconstitutional Conditions of Confinement under the Fourteenth Amendment and 42 U.S.C. § 1983**
**Against Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Offer Rada, and Defendant Officer Martinez**

151.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

152.    Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Offer Rada, and Defendant Officer Martinez purposefully and knowingly placed Mikayla, a pregnant woman, in a cell covered in feces, vomit, blood stains, and vermin, and that

had no air circulation, for several weeks during the summer of 2022. They further purposefully and knowingly provided her a filthy blanket with feces in it and refused to provide her with cleaning supplies to clean her cell or a towel to dry herself off after her showers. These conditions were so horrible that Mikayla fainted and hit her head from exposure to the noxious space.

153.    These conditions deprived Mikayla of her basic human needs, posed an unreasonable risk of harm to Mikayla's health and/or safety, and were well below contemporary standards of decency.

154.    Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Offer Rada, and Defendant Officer Martinez were aware of and disregarded this unreasonable risk.

155.    Defendant Officer Lozano, Defendant Officer Lagarde, Defendant Officer Hodges, Defendant Offer Rada, and Defendant Officer Martinez's actions were not rationally connected to a legitimate, non-punitive purpose and were excessive in relation to any such legitimate purpose or were entirely punitive in nature.

156.    Defendants' actions were malicious or made with reckless disregard for Mikayla's constitutional rights.

157.    Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

**COUNT VIII**
**Unconstitutional Conditions of Confinement under the Fourteenth Amendment and 42**
**U.S.C. § 1983**
**Against Defendant Harris County (*Monell* Liability)**

158.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

159.    Mikayla filed numerous complaints and grievances about the squalid conditions in

which she was forced to live by HCJ guards during June 2022, including specific reference to the lack of air flow and the bed bugs in her cell.

160.   Her mother, Ms. Nash, also lodged numerous calls and complaints to HCJ supervisors about the conditions in which her child lived, including 26 calls and a formal complaint with the Inmate Care and Concerns line. Staff on the Inmate Care and Concerns line responded to Ms. Nash and confirmed their awareness that Mikayla had received a soiled blanket. They further confirmed that Mikayla had been given a clean blanket after Ms. Nash's complaint.

161.   Notably, the blanket incident was reported to the Texas Commission on Jail Standards, which confirmed that this incident fell below their minimum standards for jails, about which HCJ leadership doubtlessly knew.

162.   Based on these complaints and grievances, this Court may infer that HCJ supervisors and leadership were aware of the unconstitutional conditions in which Mikayla was detained, yet they failed to take any actions to rectify these conditions for over a week, at minimum. This failure to respond and correct guards' conduct serves as a ratification that renders jail leadership liable for these decisions as official policy or practice decisions of the Jail.

163.   Mikayla's injuries were caused in substantial part by this ratified policy or practice of HCJ.

164.   Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## COUNT IX
## Deliberate Indifference under the Fourteenth Amendment and 42 U.S.C. § 1983
## Against Defendant Harris County (*Monell* Liability)

165.   Mikayla incorporates each paragraph of this Complaint as if fully restated here.

166.    Defendants were aware of and deliberately indifferent to a serious risk of harm to Mikayla by placing her in solitary confinement after her series of assaults by guards and other prisoners.

167.    Courts—including courts within this circuit—have ruled that excessive periods of solitary confinement may violate the Eighth and Fourteenth Amendments. Solitary confinement can cause or exacerbate suicide attempts, self-mutilation, depression, and other mental health issues, and these outcomes are well-known in scientific and jurisprudential literature.

168.    Mikayla warned medical staff numerous times during her detention in HCJ that she was suicidal, and medical staff was also aware that she was taking several mental health medications for mental health conditions that are listed all over HCJ's medical records for her.

169.    In solitary confinement, she was unable to access these medications, which exacerbated her mental health crisis—another fact of which HCJ medical staff was or should have been aware as medical professionals.

170.    Guards who were involved in this housing placement also were aware that Mikayla had recently lost her pregnancy and had been physically and sexually seven additional times after that tragic loss, which any reasonable person would understand left Mikayla emotionally and mentally fragile.

171.    Within days of being placed in solitary confinement, Mikayla attempted to commit suicide. Even after this attempt, HCJ staff did not remove her from solitary confinement conditions and instead kept her confined in those harmful conditions until her release over a week later.

172.    HCJ officials disregarded Mikayla's medical and safety needs by placing and retaining her in solitary confinement for nearly two weeks, despite overt and obvious signs of the harm this placement caused.

173.    Defendants' actions were the direct and proximate cause of the violations of Mikayla's constitutional rights and the damages she suffered, including pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## COUNT X
### Assault and Battery, Texas State Law
### Against Defendant Officer Arnoldo Martinez in his individual capacity

174.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

175.    Defendant Officer Arnoldo Martinez's contact with Mikayla's body in or around June 6 or 7, 2022 constituted an assault because Defendant Martinez intentionally, knowingly, or recklessly caused injury to Mikayla and her fetus, in violation of Texas law. *See* Tex. Penal Code Ann. § 22.01(a); *Caver v. Clayton*, 618 S.W.3d 895, 902 n.3 (Tex. Ct. App. 2021) (noting that the elements for civil assault are the same as the elements for criminal assault).

176.    Shoving Mikayla against a wall stomach-first with the knowledge that she was pregnant is, at minimum, reckless or knowing, and it certainly rises to the inference of an intentional act with Defendant Martinez's statement that he did not "care about you or your bastard babies."

177.    Defendant Martinez's actions were the direct and proximate cause of the violations of Mikayla's rights under Texas state law and the damages she suffered, including the loss of her pregnancy, loss of enjoyment of life, pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## COUNT XI
### Wrongful Death of an Unborn Child, Texas State Law
### Against Defendant Officer Arnoldo Martinez in his individual capacity

178.    Mikayla incorporates each paragraph of this Complaint as if fully restated here.

179.     Defendant Officer Arnoldo Martinez's assault of Mikayla in or around June 6 or 7, 2022 caused the death of Mikayla's fetus through his willful act and/or gross negligence in assaulting her when he knew she was pregnant and in a way that directly harmed her fetus, in violation of Texas Civil Practice and Remedies Code Annotated §§ 71.002, 71.009.

180.     Shoving Mikayla against a wall stomach-first with the knowledge that she was pregnant is, at minimum, gross negligence and certainly rises to the inference of a willful act with Defendant Martinez's statement that he did not "care about you or your bastard babies."

181.     Her fetus constituted "individuals" under the terms of this Act. *See id.* § 71.002(b).

182.     Defendant Martinez had subjective knowledge of the risk of extreme harm to Mikayla and her fetus because Mikayla notified him during the assault that she was pregnant, and he acknowledged knowing that she was pregnant by his statement about her "bastard babies."

183.     Defendant Martinez nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Mikayla and her unborn children.

184.     Defendant Martinez's actions were the direct and proximate cause of the violations of Mikayla's rights under Texas state law and the damages she suffered, including the loss of her pregnancy, loss of enjoyment of life, pain, suffering, emotional distress, and other economic and non-economic losses in an amount to be proven at trial.

## REQUEST FOR RELIEF

Mikayla respectfully requests that this Court grant the following relief in this case:

1.  Enter judgment in favor of Mikayla Savage and against Defendants.

2.  Award Mikayla compensatory damages for her physical injuries and pain and suffering under the Fourteenth Amendment.

3.  Award Mikayla punitive damages under the Fourteenth Amendment.

4.  Award Mikayla costs and reasonable attorney's fees as allowed by law.

5.  Award any other relief this Court deems just, equitable, and proper.

### JURY DEMAND

Mikayla respectfully requests that this matter be tried before a jury of her peers.

Dated: August 29, 2024                       Respectfully submitted,

*/s/ Karley T. Buckley*
Karley T. Buckley
DLA Piper LLP (US)
Texas Bar No. 24123596
845 Texas Avenue, Suite 3800
Houston, Texas 77002
(713) 425-8421
karley.buckley@us.dlapiper.com

Miriam R. Nemeth (DC Bar #1028529)*
D Dangaran (BBO #708195)*
RIGHTS BEHIND BARS
416 Florida Avenue, NW #26152
Washington, D.C. 20001
(202) 455-4399
miriam@rightsbehindbars.org
d@rightsbehindbars.org

David H. Bamberger
DLA Piper LLP (US)
DC Bar #362285*
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4500
david.bamberger@us.dlapiper.com

John C. Canoni
DLA Piper LLP (US)
Texas Bar No. 24117335*
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
(214) 743-4500
john.canoni@us.dlapiper.com

*Attorneys for Plaintiff Mikayla Cheyenne Savage*

*Admitted pro hac vice